4 F.3d 541
 CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, and Companies in
Interest, subscribing to London policy number 79
DD 193C, Plaintiffs-Appellants,
v.
The FIDELITY AND CASUALTY INSURANCE COMPANY of NEW YORK,
Defendant-Appellee.
 No. 92-2061.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 16, 1993.
Decided Sept. 10, 1993.
Rehearing and Suggestion for Rehearing
En Banc Denied Dec. 14, 1993.
 
 Dwight B. Palmer, Jr. (argued), Stanley C. Nardoni, Keck, Mahin & Cate, Chicago, IL, for plaintiffs-appellants.
 Peter E. Kanaris, Henry R. Daar (argued), Kostow & Daar, Chicago, IL, for defendant-appellee.
 Before CUMMINGS and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 CUMMINGS, Circuit Judge.
 
 
 1
 After Terrence Fahy was run over by an asphalt roller built by Dresser Industries, Inc., he sued and won a $3 million verdict. Dresser's primary insurer, Fidelity and Casualty Insurance Company of New York, paid $1 million of Fahy's award. Dresser's excess carrier, Underwriters at Lloyd's, London, and Companies in Interest ("Lloyd's"), paid $2 million. Lloyd's is now suing Fidelity to recoup the $2 million, claiming that Fidelity negligently failed to settle Fahy's product liability suit against Dresser for $75,000. The district judge granted Fidelity's motion for summary judgment on the ground that Fidelity had no authority to settle the Fahy suit and thus breached no duty to Lloyd's. We disagree, and remand the case so that Lloyd's can pursue its tort claim against Fidelity.
 
 
 2
 Fahy was crushed by the asphalt roller in August 1979. Two years later he brought a strict liability suit in Missouri state court against Dresser, as designer and manufacturer of the roller, and three other defendants. Fahy alleged that Dresser caused his injuries by failing to include an emergency stopping device on the roller because such a device would have prevented the roller from running over him when he fell from the operator's seat. He sought $4.2 million in damages. Dresser notified Fidelity and Lloyd's, its primary and excess liability insurers, of the suit.
 
 
 3
 Dresser had two insurance policies and a contract arguably relevant to the legal questions in this case. Its primary policy with Fidelity covered personal injury awards up to $1 million per occurrence, subject to a $10,000 deductible. This policy required Fidelity to defend the Fahy suit, but Dresser had to cooperate in defense or settlement, and Fidelity retained an exclusive right to settle as it deemed expedient. Dresser's excess policy with Lloyd's covered up to $20 million of liabilities exceeding the $1 million limit on Dresser's Fidelity policy. Dresser also had a contract with Underwriter's Adjustment Company ("UAC"), an affiliate of Fidelity's, to settle non-product liability claims below the $10,000 deductible on Dresser's primary policy.
 
 
 4
 The record suggests that Dresser controlled the Fahy case,[1] although Fidelity approved Dresser's retention of a St. Louis law firm to defend the suit and was fully informed of all developments in the litigation. In September 1984 the St. Louis defense counsel wrote Dresser and Lloyd's to predict that the jury would find for Fahy with a verdict between $500,000 and $1.5 million. He concluded that $500,000 would settle the case, with Dresser paying $225,000 and the other defendants $275,000. Later that month, he sent Dresser some recent Missouri appellate decisions supporting Dresser's liability, and that October, Lloyd's urged Dresser to settle. Dresser refused, saying it was not liable to Fahy. In January, Lloyd's demanded that Dresser settle but was rebuffed. Trial was set for June 1985.
 
 
 5
 Shortly before trial, Fahy reduced his settlement demand from $1.2 million to $500,000 against all four defendants, and Lloyd's asked Dresser's trial counsel for a recommendation about the new settlement offer. He replied that a Dresser in-house counsel, David Young, had ordered him "not to consider or pursue settlement, since Dresser management had made a determination that its asphalt roller was not defective * * *." Four days later trial counsel sent another letter to Lloyd's and Dresser. He reiterated that Fahy had reduced his settlement demand to $500,000 and recommended that Dresser pay $200,000 as its share because its jury exposure was $1.5 to $4 million. On the same day, Lloyd's demanded that Dresser settle the suit for $200,000.
 
 
 6
 On the eve of trial, two of the defendants settled with Fahy for $75,000 each. A Dresser inter-office memorandum by David Young noted that Dresser and the vendor, the remaining defendants, could also settle for $75,000 each. Young recommended that Dresser accept, but the management refused. Trial began on June 24, 1985. Four days later, Dresser's St. Louis defense counsel advised Young that Fahy's attorney had begun to doubt the strength of his case and would still settle against Dresser for $75,000. Dresser would only consider $35,000. On July 3, the jury returned a $3 million verdict against Dresser but absolved the co-defendant vendor. The Missouri Supreme Court affirmed the award on November 17, 1987.
 
 
 7
 Dresser had stood on principle, and consequently its insurers had to bear the loss. Fidelity and Dresser respectively paid Fahy $1 and $2 million, and Dresser turned to Lloyd's for reimbursement under the excess policy. In September 1988 Lloyd's paid nearly all of Dresser's $2 million claim subject to a reservation of rights,[2] and then filed a tort action in the Circuit Court of Cook County, Illinois, claiming that Fidelity negligently failed to settle the Fahy suit. Fidelity removed the case to district court and sought summary judgment before the magistrate judge, who recommended denying Fidelity's motion.
 
 
 8
 The district court disagreed. It relied on Dresser's contract with UAC, which gave UAC authority to settle non-product liability claims under $10,000 but reserved for Dresser sole control over all others. Since UAC was Fidelity's affiliate, the court found that the UAC contract modified Dresser's primary policy with Fidelity, and concluded that the UAC contract gave Dresser full control of products liability claims like the Fahy suit that were covered by the primary policy. Under this analysis, Fidelity had no power and therefore no duty to force Dresser to settle the Fahy suit, and the district court granted Fidelity's motion for summary judgment. 789 F.Supp. 927.
 
 
 9
 On appeal, Lloyd's vigorously renews the position it argued below: that Dresser's UAC contract did not modify or conflict with Fidelity's obligations to Dresser under its primary policy. The sole question decided by today's opinion is easily framed: under the UAC contract and the Fidelity policy, did Dresser or Fidelity have authority to control and settle the Fahy suit? If Dresser did, the district court was correct to find that Fidelity breached no duty to settle, and Lloyd's suit cannot prevail as a matter of law. If Fidelity was responsible for the Fahy litigation, however, its hands-off approach may have breached a duty to Dresser or to Lloyd's, and summary judgment must be reversed so that the issue can be resolved at trial. Certain Underwriters of Lloyd's v. General Accident Insurance Co. of America, 909 F.2d 228, 232-233 (7th Cir.1990). A review of the UAC contract and the Fidelity policy shows that Fidelity, not Dresser, was responsible for defense of the Fahy suit.
 
 
 10
 On January 16, 1979, UAC and Dresser contracted for UAC to settle small claims brought against Dresser. This agreement gave UAC control of claims under $10,000 that did not involve products liability. UAC had no authority to settle any products liability claim or other claims over $10,000.[3] Indeed, Fidelity has admitted that UAC lacked the authority to settle products liability claims without Dresser's approval (App. at 249-250), and the affidavit of Dresser's in-house litigation counsel states that "Dresser had full settlement authority, UAC none" over such claims. App. at 258. A week after Dresser signed the UAC contract, Fidelity and Dresser executed a policy for Fidelity to insure personal injury claims against Dresser up to $1 million per occurrence. This policy required Fidelity to defend Dresser and gave Fidelity sole power to decide whether a claim should be fought or settled.[4] Dresser had to notify Fidelity of all claims under the policy and cooperate in their settlement or defense. Without Fidelity's consent, Dresser could not pay claims or assume obligations under the policy except at its own expense. App. at 79, 85.
 
 
 11
 Given these facts, the district judge erred in concluding that the UAC contract modified Dresser's insurance policy with Fidelity. First, the UAC contract predated Dresser's policy with Fidelity, and therefore could not "modify" it in any traditional contractual sense of the word. After signing the UAC contract on January 16, 1979, Dresser retained full rights to settle products liability claims. Dresser thus was free, a week later, to transfer these rights to Fidelity under the $1 million primary policy. In Article VII of their insurance contract, Dresser and Fidelity stated that their policy embodied all agreements relating to that insurance (App. at 67), and thus Fidelity cannot argue here that the primary policy incorporated or relied on the Dresser-UAC agreement. The primary policy gave Fidelity authority to settle products liability suits against Dresser, and nothing in Dresser's earlier contract with UAC conflicts with or modifies the primary policy's plain terms.
 
 
 12
 We therefore conclude that Fidelity had a contractual duty to defend or settle the Fahy case for Dresser. At this juncture we express no opinion on the scope of that duty, whether Fidelity breached that duty, or whether Lloyd's may proceed against Fidelity under an equitable subrogation or direct duty theory of liability or both.[5] Equitable subrogation allows Lloyd's to sue Fidelity for its breach of duties owed to Dresser; "direct duty" recovery allows Lloyd's to sue Fidelity for its breach of duties owed to Lloyd's. Compare Certain Underwriters, 909 F.2d at 232-233, with American Centennial Insurance Co. v. American Home Assurance Co., 729 F.Supp. 1228, 1230-1233 (N.D.Ill.1990), and Ranger Insurance Co. v. Home Indemnity Co., 714 F.Supp. 956, 961 (N.D.Ill.1989). See John C. McCarthy, Recovery of Damages for Bad Faith, Sec. 2.11 at 336-341 (1990); Allan D. Windt, Insurance Claims and Disputes, Sec. 7.08 at 410-413 (1988); Stephen S. Ashley, Bad Faith Actions; Liability and Damages, Sec. 6.10 at 26-33 (1984). The availability of direct duty recovery may depend on which state's law applies, and the parties have not briefed conflicts issues in this appeal.
 
 
 13
 Fidelity and Lloyd's view the Fahy litigation from heatedly different perspectives. Fidelity argues that under Missouri law, the Fahy suit was a long shot, and Dresser and Fidelity agreed it should be defended in court. Lloyd's paints a different picture, where Dresser wavered over the merits of Fahy's claims and drifted into an ill-advised and disastrous jury trial, rudderless without Fidelity's guiding hand. Because these issues cannot be resolved in this appeal, and because the district court erred in holding that Fidelity had no duty to defend or settle the Fahy suit, we reverse the grant of summary judgment for Fidelity and remand for trial before a different district judge under Circuit Rule 36.
 
 
 14
 COFFEY, Circuit Judge, dissenting.
 
 
 15
 Fourteen years ago in August of 1979, Terrence Fahy was crushed by an asphalt roller manufactured by Dresser Industries. In the resulting product liability litigation, Fahy received a $3 million judgment against Dresser which was ultimately affirmed by the Missouri Supreme Court. One million dollars was paid by Dresser's primary insurer, the defendant Fidelity and Casualty Insurance Company ("Fidelity"), and the remaining $2 million were were paid by the plaintiff in the present action, Certain Underwriters at Lloyd's ("Lloyd's"). In the litigation before us Lloyd's seeks to recover the $2 million it paid to Fahy from Fidelity for Fidelity's failure to settle the claim within the primary policy limits. The majority frames the question in the case before us as "did Dresser or Fidelity have authority to control and settle the Fahy suit?" Op. at 543. I am of the opinion that it is irrelevant who had control of the suit because even if Fidelity had the sole authority to control the litigation and settle the lawsuit, it did not breach any duty owed to Dresser much less to Lloyd's and thus cannot be liable for failure to settle the underlying litigation. Because the majority has chosen to decide the case on the issue of who had the contractual right to control the underlying litigation, it is appropriate to address this issue initially.
 
 
 16
 I. Who controlled the litigation?
 
 
 17
 The majority's analysis of who controlled the litigation is accurate as far as it goes but fails to take into consideration what took place during the course of the product liability litigation. Although the primary insurance contract between Dresser and Fidelity imposed on Fidelity a "duty to defend," that obligation may have been modified by a claims service contract entered into between Dresser and Underwriters Adjusting Company ("UAC"). The claims service contract authorized UAC to investigate all claims against Dresser and make settlements in those cases below Dresser's $10,000 deductible in its primary policy but the claims service contract gave Dresser complete authority to control litigation or settlement of products liability claims. The district court found that the claims service contract modified the primary insurance contract and authorized Dresser to control litigation in product liability claims. The majority's brief discussion explaining why the contract was not modified fails to take into consideration the subsequent actions of the parties. A contract modification alters a contract through introduction of new elements into the details of a contract and canceling others, while leaving the general purpose and effect of the contract intact. Chicago College of Osteopathic Medicine v. George A. Fuller Co., 776 F.2d 198, 208 (7th Cir.1985). See also 6 Corbin on Contracts Sec. 1293 (1962).[1] Thus the conduct of the parties is relevant to determining whether a modification occurred.
 
 
 18
 A glaring omission in Lloyd's argument is the failure to present us with any authority stating that Fidelity was prohibited from modifying its insurance contract with Dresser, or that Fidelity was prohibited from permitting Dresser to litigate the underlying products liability action through hiring independent counsel. Certainly Lloyd's could very easily have written into its contract with Dresser that it was relying on Fidelity to control the litigation strategy or that any modification of the primary insurance contract (between Dresser and Fidelity) must meet the approval of Lloyd's. It is equally disconcerting that the majority's decision to remand the case will provide Lloyd's with a second bite at the apple in a case where it failed to properly defend against the motion for summary judgment as evidenced by its refusal to file any affidavits or take any depositions. Above all, parties who have demonstrated a lack of diligence in prosecuting a claim certainly should not be granted a second opportunity before the district court in what may conceivably amount to prejudice to the successful litigant.
 
 
 19
 I also find unpersuasive Lloyds' argument that there was a "secret agreement" between Dresser and Fidelity to conceal from Lloyd's the claims service contract. What possible incentive would Fidelity have to form a secret agreement with Dresser that removed from Fidelity the ability to control litigation or settlement of a lawsuit in which Fidelity stood to be liable for $1 million in damages? Certainly Fidelity would not idly stand by and suffer a $1 million judgment if it thought Dresser should accept a settlement offer within the primary insurance coverage. Accordingly, I am of the opinion that the district court's decision can and should be affirmed on the basis of contract modification, making a remand unnecessary because Fidelity had no contractual control over the litigation.
 
 II. Fidelity owes no duty to Lloyd's
 
 20
 Even if, as the majority maintains, Fidelity was in control of the litigation, Lloyd's must establish that Fidelity owed Lloyd's a duty and breached that duty in order to hold Fidelity liable. The only two possible means of recovery for Lloyd's are under the equitable subrogation and direct duty doctrines.
 
 A. Equitable Subrogation
 
 21
 "Equitable subrogation is a legal fiction which provides that a person who pays a third party's debt is substituted or subrogated to all the rights and remedies of that party." Certain Underwriters of Lloyd's v. General Accident Ins. Co., 909 F.2d 228, 232 (7th Cir.1990) (interpreting Indiana law). In other words, the excess insurer " 'stands in the shoes of the insured.' " Id. (quoting Commercial Union Assur. Cos. v. Safeway Stores, Inc., 26 Cal.3d 912, 164 Cal.Rptr. 709, 712, 610 P.2d 1038, 1041 (1980)). "A subrogee, however, acquires no greater or lesser rights than those possessed by the subrogor." Id.; Dworak v. Tempel, 17 Ill.2d 181, 161 N.E.2d 258, 263 (1959) ("a person who, pursuant to a legal liability, has paid for a loss or injury resulting from the negligence or wrongful acts of another will be given the rights of the injured person against the wrongdoer"). When the insured refuses to settle based on a belief that it is not liable, the excess insurer cannot maintain an action against the primary insurer. See, e.g., Puritan Insurance Co. v. Canadian Universal Insurance Co., 775 F.2d 76, 80 (3rd Cir.1985).[2] In Puritan, the insured refused to settle after being fully informed of developments in the case, consulted on theories of liability, and urged to settle by the excess carrier. The Third Circuit concluded that the insured would have no claim against the primary insurer because the insured directed the primary insurer not to settle, thus the excess insurer, who stood in the shoes of the insured, had no claim against the primary insurer. Id. Likewise in Certain Underwriters, this court concluded that "as a matter of law, [the insured's] consent [to try a case] would bar [the excess insurer's] recovery" against the primary insurer. Certain Underwriters, 909 F.2d at 233. Another way to look at the situation is that the primary insurer can assert any defense against the excess insurer as it would against the insured. See id. at 232. Thus, in the case before us, if Dresser had brought suit against Fidelity for failure to settle, Fidelity could have defended the suit arguing that Dresser not only consented to litigating the Fahy claim rather than settling it but also actively participated in the litigation decisions. Since Lloyd's stands in the shoes of Dresser and has no greater rights against Fidelity than Dresser had, Fidelity's consent defense is also valid against Lloyd's. Therefore, Lloyd's cannot prevail on an equitable subrogation claim.
 
 B. Direct Duty
 
 22
 As an alternative basis for recovery, Lloyd's contends that Fidelity owed Lloyd's a duty to exercise good faith in its handling of the Fahy litigation. Lloyd's argues that Fidelity breached its direct duty to the excess insurer by failing to accept Fahy's settlement offer which exposed Lloyd's to liability above the primary policy limit of $1 million.
 
 
 23
 Direct duty liability to excess insurers is a controversial subject in insurance law. While nearly all states recognize a duty of good faith and fair dealing between primary insurers and insureds, due to the lack of a contractual relationship between the excess insurer and the primary insurer, courts are reluctant to impose on primary insurers an independent direct duty liability to excess insurers. See, e.g., Puritan, 775 F.2d at 80; American Centennial Ins. Co. v. Canal Ins. Co., 843 S.W.2d 480, 483 (Tex.1992); Walbrook Ins. Co. v. Unarco Indust., Nos. 90C5111, 9011519, 1992 WL 159266, at * 1-2, 1992 U.S. Dist. LEXIS 9447 at * 9 (N.D.Ill. June 23, 1992); Great Southwest Fire Ins. Co. v. CNA Ins. Cos., 557 So.2d 966, 969 (La.1990); Commercial Union Assur. Cos. v. Safeway Stores, Inc., 26 Cal.3d 912, 164 Cal.Rptr. 709, 714, 610 P.2d 1038, 1043 (1980); Allstate Ins. Co. v. Reserve Ins. Co., 116 N.H. 806, 373 A.2d 339, 340 (1976) ("perceiv[ing] no relationship between the two insurers which ... impose[d] directly upon [the primary insurer] a duty to exercise due care in regard to [the excess insurer]"); The Duty to Settle, 76 VA.L.REV. at 1205 ("Duty-to-settle liability to excess insurers promotes settlement of tort actions against insureds, but its costs include increasingly 'internecine' litigation among the insurance companies that share potential liability for large risks.").
 
 
 24
 In its opinion, the majority states "[t]he availability of direct duty recovery may depend on which state's law applies." Op. at 544. I disagree for "[c]onflicts rules are appealed to only when a difference in law will make a difference to the outcome." International Adm'rs, Inc. v. Life Ins. Co. of North Am., 753 F.2d 1373, 1376 n. 4 (7th Cir.1985). I am not persuaded that we need to remand this case for a determination of which state's law applies because Lloyd's cannot prevail under the law of any of the states with significant contacts to the litigation (Illinois, Missouri and Texas). Neither Texas nor Missouri have ever adopted the doctrine of direct duty nor has any Illinois state court accepted the doctrine. The only hope Lloyd's has of prevailing is under Illinois law based on the two federal district court opinions that have applied the direct duty doctrine. See Ranger Ins. Co. v. Home Indem. Co., 714 F.Supp. 956, 961 (N.D.Ill.1989) ("We believe that the Illinois Supreme Court would impose such a duty and allow an excess carrier to bring suit in its own right to remedy a breach of that duty"); accord American Centennial Ins. Co. v. American Home Assur. Co., 729 F.Supp. 1228, 1231 (N.D.Ill.1990). A more recent opinion from a federal district court in Illinois, however, expressly rejected the idea that the Illinois Supreme court would adopt the direct duty doctrine. Walbrook Ins. Co. v. Unarco Indust., Inc., Nos. 90C5111, 9011519, 1992 WL 159266, at * 3, 1992 U.S. Dist. LEXIS 9447 at * 9 (N.D.Ill. June 23, 1992) ("[i]n the absence of a relationship, contractual or otherwise, between the primary and excess insurers, the court does not believe the Illinois Supreme Court would impose a direct duty upon the primary insurer ") (emphasis added). In Walbrook, the court rejected the excess insurer's argument that a primary insurer owes an excess insurer a direct duty of good faith. The excess insurer in Walbrook made the very argument that Lloyd's makes before us, i.e., it was reasonably foreseeable that the excess insurer would suffer harm from the primary insurer's failure to settle a claim within policy limits. The court held
 
 
 25
 "Foreseeability of harm will not always result in a direct duty of good faith to third parties. In this case, the excess insurers could have contracted with the insured for protection; for example, they could have required the insured to get the excess insurers' approval before settling with the primary insurer. In the absence of a relationship, contractual or otherwise, between the primary and excess insurers, the court does not believe the Illinois Supreme Court would impose a direct duty upon the primary insurer."
 
 
 26
 Id. Based on Ranger, American Centennial and Walbrook, the best that can be said for Lloyd's direct duty claim under Illinois law is that it is uncertain. However, even if we assume for the sake of argument that Fidelity owes Lloyd's a direct duty of good faith under Illinois law, Ranger and American Centennial clearly state that the duty owed to an excess insurer does not exceed the duty Fidelity owed to the insured Dresser. In Ranger, the court declared "[a]s long as the scope of the duty is appropriately defined, the primary carrier is not held to a standard of care that it did not already owe to the insured." Ranger, 714 F.Supp. at 961 (emphasis added). In American Centennial, the court stated "imposing this duty on a primary liability carrier in favor of an excess liability carrier will place no additional burden on a primary carrier since a primary carrier indisputably owes an identical duty to its insured if there is no excess coverage applicable to a particular claim against the insured." American Centennial Ins., 729 F.Supp. at 1232 (emphasis added). In other words, even under a direct duty theory, Fidelity owed Lloyd's no greater duty than it owed Dresser. Because Dresser maintained that the asphalt roller was not defective and refused all settlement offers, Fidelity cannot be liable to Lloyd's (who has no greater rights against Fidelity than Dresser would) for failure to settle the case within the primary policy limits. Ranger and American Centennial make clear that even under Illinois law Fidelity did not breach a duty to Lloyd's because it did not breach a duty to Dresser who directed that the case proceed to trial rather than accepting a settlement. See supra at 546-47 (discussing equitable subrogation). Neither Ranger nor American Centennial extend the direct duty doctrine to the level that Lloyd's asks of this court. Lloyd's seeks to impose liability on a primary insurer (Fidelity) who permitted its client to litigate rather than settle a product liability claim. Lloyd's has failed to cite any authority from any court holding that the primary insurer is liable to the excess insurer for failing to settle if the insured believes that it is not liable in the underlying litigation and decides to take a case to trial.
 
 
 27
 There is no factual dispute regarding Dresser's unequivocal decision to proceed to trial and refusal to settle, thus I fail to see how Fidelity can be found liable for breaching a duty owed to Lloyd's to settle within the primary policy limits. I am of the opinion that recovery is not possible for Lloyd's under equitable subrogation or under direct duty in any of the contact states, thus our remand to the district court would seem to be merely a perfunctory exercise. Howland v. Kilquist, 833 F.2d 639, 646 (7th Cir.1987) ("it would be an exercise in futility and a waste of judicial resources to remand this cause"). Because I am of the opinion that we should affirm the district court, I respectfully
 
 
 28
 DISSENT.
 
 
 
 [1]
 The account offered here reflects Lloyd's perspective on the Fahy trial, since Lloyd's resisted summary judgment. We omit many disputed facts that relate to whether Fidelity breached any duty to Dresser--and also to Lloyd's--during the Fahy litigation, because resolution of these disputes must await the trial we order today
 
 
 [2]
 An insolvent Lloyd's affiliate owes Dresser $19,200
 
 
 [3]
 The relevant provisions provided (App. at 260-261):
 [UAC agrees] To obtain the prior approval of Dresser before agreeing to the payment of claims or losses (including allocated loss expenses) in excess of the settlement authority limit specified below:
 (a) Products Liability -0-
 (b) All others applicable $10,000
 [Dresser agrees] UAC shall have full authority and control in all matters pertaining to the adjustment, handling, investigation, administration of claims and losses within the discretionary settlement authority limit and may make such adjustment or settlement of claims within discretionary settlement authority limit which in its judgment it deems proper unless Dresser notified UAC to the contrary on any specific claim.
 
 
 [4]
 Fidelity promised to (App. at 79):
 Defend any suit against [Dresser] alleging such personal or bodily injury * * * even if such suit is groundless, false, or fraudulent; but [Fidelity] may make such investigation, negotiation, and settlement of any claim or suit as it deems expedient * * *.
 
 
 [5]
 Since Fidelity did indeed have authority to settle the Fahy suit, it is not at all clear from the record whether its failure to do so breached a duty to Dresser. Therefore we disagree with the dissent's argument (at part II) that Lloyd's could not prevail on remand regardless of Fidelity's contractual responsibilities
 
 
 [1]
 Since Lloyd's had no privity to the contract between Dresser and Fidelity, it cannot complain that such a modification took place. Lloyd's only recourse would have been to specify in its contract with Dresser that Dresser could not control litigation of product liability claims. See Kent D. Syverud, The Duty to Settle, 76 VA.L.REV. 1113 (1990)
 
 
 [2]
 In cases in which the insured lacks excess coverage and sues its primary carrier for failing to settle, courts have consistently held that the primary insurer is not liable for litigating a case of questionable liability. See, e.g., Ranger County Mutual Ins. Co. v. Guin, 723 S.W.2d 656, 658 (Tex.1987); Kavanaugh v. Interstate Fire & Casualty Co., 35 Ill.App.3d 350, 342 N.E.2d 116 (1975); Eklund v. Safeco Ins. Co., 41 Colo.App. 96, 579 P.2d 1185 (1978)