**INTERSTATE INDEMNITY COMPANY, Plaintiff,**

**v.**

**UTICA MUTUAL INSURANCE COMPANY, Defendant.**

**No. 90–CV–3847–WDS.**

United States District Court, S.D. Illinois.

March 25, 1994.

Memorandum Denying Motion to Amend or for New Trial May 2, 1994.

---

Suzanne M. Besnia, Riezman & Blitz, St. Louis, MO, for plaintiff.

Beth Kamp Veath, Russell F. Watters, Brown & James, St. Louis, MO, for defendant.

John L. McMullin, III, James E. Whaley, Brown & James, St. Louis, MO, for intervenor.

## MEMORANDUM AND ORDER

STIEHL, District Judge:

In this diversity action which was tried without a jury, plaintiff seeks to recover $1,000,000 from defendant for funds which plaintiff contributed to the settlement of a products liability suit in the Circuit Court for the Twentieth Judicial Circuit, St. Clair County, Illinois, *Heiple v. Howell Electric Motors, Inc.*, 83–L–153. Plaintiff claims that defendant breached its duty of good faith and fair dealing and was negligent by failing to settle, or make reasonable offers to settle, the underlying action, and failing to timely, accurately, or adequately provide certain information to defendant, resulting in plaintiff being required to make a $1,000,000 contribution to the settlement.

The Court has diversity jurisdiction over this matter, 28 U.S.C. § 1332, as the parties are citizens of Illinois and New York, and the $50,000 amount in controversy requirement is clearly satisfied. The parties agree that Illinois substantive law governs this action, and in applying Illinois law, the Court must predict how the Illinois Supreme Court would decide this case. *Mason v. Ashland Exploration, Inc.*, 965 F.2d 1421, 1424 (7th Cir.1992).

The Court makes the following findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

1. Plaintiff is an Illinois corporation with its principal place of business in Illinois, while defendant is a New York corporation with its principal place of business in New York.

2. Defendant issued a comprehensive general liability policy to S.F.M. Corporation which provided coverage of $1,000,000, and undertook a duty to defend liability claims against the insured for injuries occurring during the effective dates of the policy, January 1, 1981, through January 1, 1982.

3. Plaintiff issued to S.F.M. Corporation a commercial umbrella liability policy for the period of January 1, 1981, through January 1, 1982. The umbrella policy provided $5,000,000 of coverage for claims against the insured which exceeded defendant's $1,000,000 policy limits. Thus, defendant was the primary insurer, and plaintiff was an excess insurer.

4. Howell Electric Motors, a division of S.F.M. Corporation, was a named insured under both the plaintiff's and defendant's policies.

5. On February 16, 1981, Laverne Heiple, employed as a journeyman press operator by Lustour Corporation, suffered a severe electric shock while attempting to plug in an electric labeling machine. Howell Electric Motors manufactured the motor in the labeling machine.

6. Heiple sustained severe permanent disabling injuries from the shock. His shoulders were permanently "frozen," resulting in a very limited ability to raise his arms.

7. Acting through their attorney, Stephen Tillery, Laverne Heiple and his wife Irene filed a personal injury action in the Circuit Court for the Twentieth Judicial Circuit, St. Clair County, Illinois, against Howell, Bobst–Champlain Corporation, Giles Armature Electric Works, Sandner Electric Corporation, and Graymills Corporation. Lustour Corporation was later added as a third-party defendant.

8. Pursuant to its duty to defend Howell, defendant assigned the defense of the *Heiple* action to the Belleville, Illinois firm of Wagner, Bertrand, Bauman & Schmeider. During the summer of 1986, the Wagner firm merged with Hinshaw, Culbertson, Moelmann, Hoban & Fuller, and the Hinshaw firm took over Howell's defense.

9. Later in 1986, Hinshaw attorney Mike Lawder assumed the position of lead attorney on the *Heiple* case. At all times relevant to this action, Lawder and Hinshaw acted as agents of defendant, within the scope of authority granted by defendant.

10. Discovery in the *Heiple* case revealed that Howell manufactured the motor in question pursuant to an order for motors from co-defendant Graymills. Graymills offered Howell a general description of the type of motor needed; Howell designed and manufactured the motors, and sold them to Graymills.

11. Graymills used the motors to develop an ink pump for printing machines. Graymills sold the ink pumps to Bobst–Champlain, who used the pumps as a component part in label printing machines.

12. Sandner Electric and Giles Armature were local repair shops that had performed repair work on the motors and machinery for Lustour Corporation.

13. Defendants have filed a motion in limine seeking to exclude the testimony of plaintiff's expert witness Richard Eichhorn, which is **DENIED**.

## A. *Pre–Trial Communication*

14. The *Heiple* action was filed on February 13, 1983. Defendant first informed plaintiff of the lawsuit in an October 23, 1984 letter. The letter noted that upon plaintiff's request, defense counsel would keep plaintiff apprised of future developments.

15. On March 15, 1985, plaintiff wrote to defendant acknowledging its status as an excess carrier, and requesting copies of pleadings, investigative findings, and other reports.

16. On April 12, 1985, Gerald Ryen, an employee of defendant, informed plaintiff that the potential jury verdict was over $1,000,000.

17. In the same letter, defendant advised plaintiff that it had placed a $300,000 reserve on the *Heiple* case. Defendant maintained the reserve at $300,000 until September 1987, when it made a note to change the reserve to $600,000–$750,000.

18. Within the insurance industry, reserves are viewed as an indicator of the value of a claim. Defendant's claims manuals express the general philosophy that a reserve should correspond to the assessed value of a claim.

19. In a June 25, 1985 letter to Ryen, plaintiff's claim representative, William Burke, indicated that he appreciated defendant's promise to send future reports, and that he would continue to monitor the case until he was convinced that plaintiff's layer of coverage would not be affected.

20. Burke also sent a letter to Howell Electric on June 25, 1985, informing Howell that "it is quite possible that a jury could award Mr. Heiple damages in excess of your policy limits" of the combined coverage of $6,000,000.

21. From the summer of 1986 until June 16, 1987, several different claims representatives were placed in charge of plaintiff's *Heiple* file. Plaintiff assigned the *Heiple* file to Ken Mann on June 16, 1987, but he did not actually review the file until August 3, 1987.

22. Mike Ryan, Howell Electric's chief engineer, was first deposed in April of 1987. Ryan testified at his deposition that the Howell motor was not manufactured in conformity with Howell's design drawings. Ryan's testimony indicated that Howell was substantially at fault in causing Heiple's injuries.

23. Plaintiff's actual correspondence file was lost prior to this litigation, so plaintiff reconstructed its file from copies and other documents. The parties presented conflicting evidence as to when plaintiff received various reports on discovery and case assessment. Defendant claims that the various documents were timely sent, and plaintiff disputes when it received the reports and documents.

24. On June 26, 1987, Lawder sent a letter to defendant stating that upon reassessment of the case, a jury verdict of $4,000,000 to $5,000,000 was entirely possible, and that Howell could be held liable for approximately two-thirds of any verdict. The letter also estimated that the Heiples would expect a settlement of $1,000,000 to $2,000,000. While defendant presented evidence that Lawder sent plaintiff a copy of the June 26 letter in a timely fashion, plaintiff admits that it received the letter on August 18, 1987. The Court therefore finds that plaintiff received the letter no later than August 18.

25. Plaintiff claims that it was not informed of the substance of Ryan's damaging deposition testimony. While defendant presented evidence that Lawder informed plaintiff of Ryan's testimony in May 1987, the Court finds that plaintiff was informed of Ryan's testimony no later than August 18, 1987, because the June 26, 1987 letter referred to Ryan's testimony.

26. On August 10, 1987, Gerald Ryen sent a letter to Interstate's Janice Richards noting that Lawder had reported a potential verdict of up to $5,000,000, and that the Heiples would likely expect a settlement of $1,000,000 to $2,000,000.

27. Mann testified that by the third week in August 1987, he realized that the case had a "bad odor": Heiple had suffered horrible injuries, the case would be tried in a pro-plaintiff jurisdiction, Ryan's testimony would be damning, and Howell's potential exposure was high.

28. On October 5, 1987, Lawder sent a final pre-trial evaluation letter to both plaintiff and defendant. The letter reiterated the potential of a $5,000,000 verdict, with a more realistic verdict of $1,200,000 to $1,700,000, and that Howell could realistically be liable for $600,000 to $1,700,000. Mann testified that plaintiff did not receive this letter. The Court finds Mann's testimony not to be credible on this point.

29. On October 16, 1987, Lawder commissioned a test on the Howell motor at Industrial Testing Lab of St. Louis. The test results seriously affected Howell's ability to spread the blame to co-defendants at trial. Plaintiff was not informed of this test.

30. At trial, plaintiff conceded that it does not seek to recover on a theory that Lawder's negligence or attorney malpractice caused the plaintiff's injury.

## B. *Settlement Negotiations*

31. During late spring or early summer of 1987, Lawder asked the Heiples' attorney, Stephen Tillery, for a settlement demand. Tillery refused to give a settlement demand until shortly before trial, when he demanded $3,500,000. Defendant did not make a settlement offer during the pre-trial stages. Plaintiff claims it was not apprised of the lack of settlement demands or offers.

32. Defendant was fully aware of the potential of a verdict of up to $5,000,000, and that Howell would likely be responsible for the great majority of any judgment.

33. Lawder was or should have been aware that the Heiples would claim $4,000,000 to $5,000,000 in damages, and that Howell could not present a plausible defense to these damage claims. Lawder also realized that a jury verdict would easily exceed defendant's policy limit of $1,000,000.

34. The *Heiple* trial commenced on October 19, 1987, but a mistrial was declared, and a new jury empaneled. Opening statements in the trial were made October 21, 1987.

35. On October 19, 1987, the first day of trial of the underlying case, defendant made its first settlement offer of $400,000. Tillery rejected this offer.

36. In an October 20, 1987 letter to defendant, Lawder requested authority to extend a $1,000,000 settlement offer. Defendant never granted Lawder authority to settle for $1,000,000.

37. On or about October 21, 1987, Mann asked defendant to try to settle the case for $1,000,000, and stated that he thought a $1,000,000 offer was necessary to constitute a good faith attempt to settle the case.

38. On October 22, 1987, defendant offered the Heiples $750,000 on behalf of Howell, but Tillery refused the offer.

39. Tillery called Michael Ryan of Howell Electric to testify in the Heiples' case-in-chief. Just as in his deposition, Ryan testified that the Howell motor suffered from a manufacturing defect. Lawder later testified in his deposition in this case that Tillery's examination of Ryan "went about as bad as it could go."

40. After Ryan's testimony and learning that the Heiples rejected a $750,000 settlement offer, plaintiff hired private counsel, Robert Wilson, on October 23, 1987, to monitor the trial.

41. On or about October 27, 1987, Wilson insisted that defendant turn over its $1,000,000 policy limits to plaintiff, and defendant tendered the $1,000,000 on October 29.

42. Wilson settled the claim against Howell for $2,000,000 on November 2, 1987. Plaintiff and defendant each provided $1,000,000 of the $2,000,000 amount.

43. The next day, November 3, 1987, co-defendant Bobst–Champlain settled for $500,000, Graymills for $50,000, and Lustour waived its $90,000 workers' compensation lien.

### C. *The Heiples' Willingness to Settle*

44. Tillery testified that he had executed a settlement agreement with the Heiples to reject all offers below $2,000,000, and that he would not have recommended settlement with Howell for any amount less than $2,000,000. Tillery also testified that he would not have settled the claim against Howell for defendant's $1,000,000 policy limits. Tillery also testified that he had rejected an offer of $1,800,000 made by Robert Schmeider, a member of the Hinshaw law firm, before accepting Wilson's $2,000,000 offer.

45. Defendant also presented the deposition testimony of Laverne Heiple. Heiple's testimony regarding his deliberations and thought process during October 1987 was ambiguous, but he did not remember signing an agreement authorizing Tillery to reject all offers of less than $2,000,000. No written settlement authorization agreement between Heiple and Tillery was introduced into evidence, and the Court finds that there was no such agreement.

46. Heiple stated that he never really "talked money" with Tillery, and that Tillery did not communicate any settlement offers to him. However, Heiple admitted that he relied on Tillery's evaluation of the case.

47. Heiple stated that Tillery "told me he wanted to put a million dollars in my hands, and to get a million dollars the man would have had to have got two million because they got half of it to start with so I presume he had to go for two million."

48. Heiple's testimony does not unequivocally establish the smallest amount of money he would have accepted as a settlement from Howell, but the passage quoted above indicated that Heiple thought that a $2,000,000 settlement was necessary, and confirms Tillery's statement.

### CONCLUSIONS OF LAW

Plaintiff's second amended complaint pleads theories of negligence and breach of the duty of good faith and fair dealing. To establish a negligence claim, a plaintiff must establish that the defendant owed a duty to the plaintiff, that defendant breached that duty, and that the breach proximately caused plaintiff's damages. *Id.* at 1425. The elements of a claim for breach of the duty of good faith and fair dealing are practically identical to the elements of a negligence claim, i.e. the defendant must owe plaintiff a duty to act in good faith and conduct fair dealing; the defendant must have breached that duty; and the breach of the duty must have proximately caused plaintiff's damages. *See Ranger Ins. Co. v. Home Indem. Co.,* 714 F.Supp. 956 (N.D.Ill.1989); *Kavanaugh v. Interstate Fire and Casualty Co.,* 35 Ill. App.3d 350, 342 N.E.2d 116 (1975).

Under Illinois law, an insurer clearly owes a fiduciary duty to its insured to protect against negligence, and to act in good faith for the best interests of the insured. *Kavanaugh,* 342 N.E.2d at 120. However, the instant case requires the Court to determine the duty owed by a primary carrier (defendant) to an excess carrier (plaintiff). No Illinois court has addressed this precise issue. Plaintiff offers five theories supporting the imposition of a duty upon an excess

carrier: equitable subrogation; direct duty; contractual subrogation; voluntary assumption of a duty; and a duty based on customs and practices within the insurance industry. One federal district court has ruled that under Illinois law, an excess carrier may be equitably subrogated to the insured's rights against the primary insurer, but that court refused to apply the equitable subrogation doctrine to the facts of the case before it. *Ranger*, 714 F.Supp. at 960. Three district court decisions have discussed the imposition of a direct duty on a primary insurer to a known excess insurer under Illinois law, and two have ruled that a direct duty exists, *American Centennial Ins. Co. v. American Home Assurance Co.*, 729 F.Supp. 1228, 1231–33 (N.D.Ill.1990); *Ranger*, 714 F.Supp. at 960–62, while one court ruled that no direct duty attaches. *Walbrook Ins. Co. v. Unarco Indus., Inc.*, 1992 WL 159266, 1992 LEXIS 9447 (N.D.Ill. June 23, 1992). The Seventh Circuit has expressly reserved ruling on the viability of the equitable subrogation and direct duty theories, stating, "we express no opinion ... [on the] equitable subrogation or the direct duty theory of liability." *Certain Underwriters at Lloyd's, London v. Fidelity and Cas. Ins. Co.*, 4 F.3d 541, 544 (7th Cir.1993). The *Lloyd's, London* court upheld a contractual duty by a primary insurer to an excess carrier, *id.*, but the existence of a contractual duty hinges upon the particular contract at issue.

■ Even if the Court were to find that defendant owed plaintiff a duty of care, and a duty of good faith and fair dealing under any of plaintiff's theories, plaintiff must still prove that defendant breached a duty, and proximately caused plaintiff to contribute to the Heiple settlement. Plaintiff presented evidence that defendant failed to settle within its policy limits, engage in reasonable settlement negotiations, and failed to timely, adequately, or accurately inform plaintiff of a substantial portion of the proceedings central to the Heiples' claim. However, defendant notified plaintiff in 1985 that the verdict could be over $1,000,000. Plaintiff was obviously aware that its coverage could be affected, because plaintiff sent a letter to Howell on June 25, 1985, informing Howell that a verdict could exceed Howell's total coverage

of $6,000,000. Even if plaintiff did not receive Lawder's correspondence at the same time defendant received the various letters, plaintiff had received nearly all relevant information over two months before trial. The Court concludes that defendant did not breach its duty to timely, adequately, or accurately inform plaintiff of its potential exposure.

■ Plaintiff also contends that defendant breached its duty to engage in reasonable settlement negotiations. Under Illinois law, an insurer has no duty to initiate settlement negotiations unless "the probability of an adverse finding on liability is great and the amount of probable damages would greatly exceed the coverage." *Kavanaugh*, 342 N.E.2d at 121. Defendant recognized the likelihood of a verdict greatly exceeding the $1,000,000 policy limit, thus defendant did owe such a duty. Lawder asked Tillery for a settlement demand as early as the spring or summer of 1987, but Tillery refused to make an offer until shortly before trial. Defendant could have placed a dollar figure on the negotiating table at an earlier juncture, but the failure to do so is not a breach of the duty to engage in reasonable settlement negotiations. Evidence established that when defendant attempted to talk about settlement, Tillery refused to make a demand. Defendant did make settlement offers near the beginning of trial, and the law does not impose a duty to make a large offer before trial commences. Thus, the Court concludes that defendant did not breach its duty to engage in reasonable settlement negotiations.

■ Even if plaintiff had established that defendant breached a duty, it must also prove that the breach proximately caused plaintiff to contribute $1,000,000 to the Heiple settlement. *See National Union Fire Ins. Co. v. Continental Ill. Corp.*, 673 F.Supp. 267, 273 (N.D.Ill.1987). The *National Union* court ruled that:

[e]ven if the insured [or excess insurer] then suffers a judgment [or settlement] in excess of the policy, it cannot collect that full amount from its [primary] insurer absent a showing that the [primary] insurer's breach also cost the insured an opportunity

to settle below the policy limits. Such proof is insisted upon to meet the causation requirement: that the insurer's breach of its duty ... was the but for source of ... liability beyond the policy limits.

*Id.* (citations omitted). The *National Union* court applied the proximate cause rule in an action by an insured against its insurer after a judgment against the insured, but the rationale behind the rule equally applies to the claim of an excess insurer against a primary insurer after a settlement paid by the excess carrier.

In *Ranger*, the court expounded upon the requirements of proximate cause, stating:

For a primary insurer to be found liable for bad faith refusal to settle, an insured (and therefore the excess carrier) must prove that the judgment creditor offered terms of settlement within the policy coverage, and there was a real possibility of an adverse judgment greater than the coverage limit.

714 F.Supp. at 962 (citations omitted). Plaintiff has overwhelmingly established the second requirement, e.g. a real possibility that the Heiples would obtain a verdict against Howell greater than defendant's $1,000,000 policy limit.

However, to establish proximate cause, plaintiff must also demonstrate that defendant's breach cost the opportunity to settle within defendant's policy limits. *Id.; National Union*, 673 F.Supp. at 273. Plaintiff can establish causation only to the extent it can demonstrate that the Heiples would have settled for an amount less than the $2,000,-000 actually paid. Through the testimony of Tillery and Laverne Heiple, defendant established that the Heiples would not have settled for less than $2,000,000. Tillery recommended settling for no less than $2,000,000 from Howell, and rejected a $1,800,000 offer from Howell. Laverne Heiple's deposition testimony did not pinpoint his "bottom dollar" for settlement from Howell, but his testimony did corroborated Tillery's statements about Heiple's settlement posture. In essence, Heiple could not name the smallest amount he would have accepted from Howell because he relied on Tillery's evaluations and recommendations. Heiple's testimony that he wanted to "pocket" $1,000,000 leads to the inference that he would not have settled for less than $2,000,000. Plaintiff has not proven that the Heiples would have settled for less than $2,000,000. Because plaintiff has failed to demonstrate that defendant's conduct cost the opportunity to settle below the $2,000,000 actually paid, plaintiff has failed to establish the essential element of proximate cause. Failure to establish proximate cause precludes recovery under a theory of negligence, or breach of the duty of good faith and fair dealing.

Defendant filed a motion for directed verdict, but the Court **DENIES** this motion as moot because the Court has made findings of fact and conclusions of law in favor of defendant, pursuant to Fed.R.Civ.P. 52(a). Therefore, the Court finds in favor of defendant Utica Mutual Insurance Company and against plaintiff Interstate Indemnity Company. The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

### *MEMORANDUM AND ORDER ON MOTION TO AMEND*

Before the Court is plaintiff's motion filed pursuant to Fed.R.Civ.P. 52(b) and 59, requesting the Court to amend its Memorandum and Order, and Judgment of March 25, 1994, or in the alternative, for a new trial.

On March 25, 1994, the Court entered a Memorandum and Order which included findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a), and ruled in favor of defendant and against plaintiff. At trial, plaintiff presented claims of negligence and breach of the duty of good faith and fair dealing. The elements of a claim under these two theories are similar, as plaintiff must demonstrate that: (1) defendant owed a duty to plaintiff; (2) defendant breached that duty; and (3) the breach proximately caused plaintiff's damages. *See Mason v. Ashland Exploration, Inc.*, 965 F.2d 1421, 1425 (7th Cir.1992); *Ranger Ins. Co. v. Home Indem. Co.*, 714 F.Supp. 956 (N.D.Ill.1989). The March 25 Order essentially examined plaintiff's two claims collectively. In discussing

the first element, duty, the Court noted the absence of Illinois and Seventh Circuit case law on the subject, and that federal district courts had split as to the existence of a duty. The Court did not rule on the question of duty, but assumed that a duty arose for the purpose of analyzing the elements of breach and causation. The Court ruled that defendant did not breach its duty to timely, adequately, or accurately inform plaintiff of its potential exposure, or its duty to engage in reasonable settlement negotiations. As to the final element, the Court held that plaintiff failed to establish that defendant proximately caused plaintiff's injury.

Pursuant to Fed.R.Civ.P. 52(b), plaintiff requests the Court to amend its March 25 Memorandum and Order and judgment. In determining a Rule 52(b) motion, the Court should correct a judgment entered erroneously. *Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1219 (5th Cir.1986). However, a Rule 52(b) motion seeking "to relitigate old issues ... or to secure a rehearing on the merits" is inappropriate. *Id.* Plaintiff contends that the Court failed to discuss, consider and determine certain material facts presented in the evidence which warrant amendment of the judgment. Plaintiff also asserts that the Court erred in failing to specifically find a duty, a breach of duty, and causation. Plaintiff has submitted fourteen pages of additional proposed findings of fact and conclusions of law. Rather than address each point raised, the Court will generally discuss the topics raised in plaintiff's motion.

First, the Court reaffirms its prior ruling on the issue of duty. Controlling case law provides no clear guidance, but nevertheless, the Court assumed that defendant did owe a duty to plaintiff. Plaintiff has proposed numerous factual findings related to the breach of a duty, several of which relate to the failure to disclose the results of an October 16, 1987 test conducted on Howell's motor, and to the alleged failure to notify plaintiff of the entirety of Mike Ryan's deposition testimony. The Court reviewed this evidence before issuing its findings of fact, and notes the previous finding that defendant did not notify plaintiff of the October 1987 product test. (Doc. # 150, ¶ 29). The Court reaf-

firms its previous conclusions that defendant did not breach its duty to timely, adequately, or accurately inform plaintiff of its potential exposure, and that defendant did not breach its duty to engage in reasonable settlement negotiations. *See Kavanaugh v. Interstate Fire and Casualty Co.,* 35 Ill.App.3d 350, 342 N.E.2d 116, 121 (1975).

Plaintiff has also proposed findings of fact which, if adopted, would establish causation. Plaintiff generally asserts that the Heiples would have settled for $1,000,000 because: (a) their attorney, Stephen Tillery, told plaintiff's attorney Robert Wilson that he would have accepted a $1,000,000 settlement; and (b) Heiple stated that Tillery told him he would "put $1,000,000 in his pocket." Tillery testified at trial that he would not have settled for less than $2,000,000, and Heiple's deposition testimony supports Tillery's testimony. The Court found Tillery's testimony credible. The March 25 Order properly found that plaintiff failed to establish that the Heiples would have settled for less than $2,000,000, and thus failed to establish causation. *See Ranger,* 714 F.Supp. at 962; *National Union Fire Ins. Co. v. Continental Ill. Corp.,* 673 F.Supp. 267, 273 (N.D.Ill.1987). The Court finds that plaintiff's proposed findings of fact and conclusions of law are not supported by the evidence before the Court, and the Court reaffirms its prior findings of fact and conclusions of law. For the above stated reasons, plaintiff is not entitled to an amendment of the March 25 Memorandum and Order, or Judgment pursuant to Rule 52(b), or to a new trial pursuant to Rule 59.

Accordingly, the Court **DENIES** plaintiff's motion to amend the March 25, 1994 Memorandum and Order, and Judgment, or in the alternative, for a new trial.

**IT IS SO ORDERED.**